CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

2016 JAN 26  P 3: 50

NO. 2016-10656                              DIVISION "N-8"
                                            CIVIL
                  LEONARD DAVIS          DISTRICT COURT

                    VERSUS

                 JANE DOE, et al.

FILED:_____          _____
                                          DEPUTY CLERK

### SECOND SUPPLEMENTAL AND AMENDING PETITION

**NOW INTO COURT,** through undersigned counsel, comes plaintiff, Leonard Davis (hereinafter "Davis"), who files his Second Supplemental and Amending Petition which sets forth additional facts to support existing claims and identifies additional causes of action.

1.

All allegations in the Original and First Supplemental and Amending Petitions are restated herein in their entirety as if copied *in extenso*, except to the extent any particular allegation is affirmatively altered by language contained herein.

### SUPPLEMENTAL MATERIAL FACTS CONCERNING THE PROCEDURAL HISTORY OF TULANE'S INTERNAL DISCIPLINARY PROCEEDING

2.

On March 29, 2016, Jane Doe ("Doe"), a student at Tulane University ("Tulane") at all times relevant hereto, reported an incident to Tulane through Julia Broussard ("Broussard"), the Assistant Director, Case Management and Victim Support Services.

3.

On that same date, Broussard apparently responded to Doe to set up an appointment.

4.

Tulane knew it is legally obligated to adhere to procedural obligations set forth in governing University documents. See *I.F. v. Administrators of the Tulane Educational Fund*, 131 So.3d 491 (La. App. 4 Cir. 12/23/13).

5.

Broussard met with Doe on April 4, 2016.

00176473.WPD;1                           1

**EXHIBIT A**

6.

On April 4, 2016, Doe alleged facts which raised a concern that the Sexual Misconduct Policy within Tulane's Code of Student Conduct may have been violated on January 30 and 31, 2016.

7.

At that time, Doe did not identify Davis.

8.

On April 11, 2016, Doe met with Vanessa Rodriguez ("Rodriguez"), who, as the then Director of the Office of Student Conduct, notwithstanding her initial investigative function, later served as Chair of the Conduct Hearing Board regarding Doe's complaint against Davis.

9.

On April 19, 2016, Doe met with and was interviewed by Jenna Rae Vercillo ("Vercillo"), then Assistant Director of Student Conduct, engaged to investigate allegations. On that day, which was less than but approaching three (3) months after the alleged violation, Doe, for the first time, specifically identified Davis as the accused.

10.

On April 20, 2016, a formal student conduct file was opened.

11.

Vercillo did not promptly seek to obtain materials which she knew or should have known may cease to be available at a certain point in time, including, but not limited to, video surveillance, recordings, dormitory access logs, and text messages.

12.

On April 21, 2016, Davis received his first notice that he was charged with misconduct for events occurring almost three months earlier on January 30 and January 31, 2016.

13.

On April 29, 2016, Vercillo interviewed Doe's roommate.

14.

Although Vercillo knew that the alleged incident was alleged to have occurred on January 30 and January 31, 2016, Vercillo delayed interviewing Davis until May 13, 2016, which, on

information and belief, was approximately 14 days after the time period that Tulane would normally keep its surveillance videos.

15.

There is no evidence Vercillo reviewed, requested to review, or requested preservation of the relevant surveillance images.

16.

On May 23, 2016, Doe sent a followup email to Vercillo advising that she, Doe, did not report the incident more immediately because she "had to emotionally neutralize."

17.

Vercillo did not interview any of Davis' identified roommates, friends, or teammates until June 13, 22, and/or 23, 2016.

18.

By this time, almost five months had elapsed since the alleged incident.

19.

At all times, as set forth in the Code of Student Conduct, Tulane knew that it was to not only perform a fair, thorough, and impartial investigation with Davis presumed not responsible, but that it bore the burden of proving that the complaint was more likely than not true pursuant to the preponderance of evidence standard.

20.

Also pursuant to the Code of Conduct, it was Tulane's declared affirmative responsibility to gather "all" the witnesses and evidence. Yet, Tulane not only unreasonably delayed its gathering of evidence but it also failed to attempt to gather all the evidence while blaming Davis for that failure.

21.

As the result of Tulane's unreasonable and prejudicial delays and failures, critical and potentially exculpatory evidence that could factually refute Doe's allegations were no longer available. These include video recordings from dormitories and other campus locations in which elements of claimed conduct occurred, and, perhaps, other locations.

22.

On July 12, 2016, Vercillo conducted a followup interview with Doe, asking, *inter alia*, whether she knew whether Davis was drunk when they left The Boot. According to Vercillo, Doe said "she did not believe he [Davis] was drunk because he told her that he was 'fine' to drive her vehicle."

23.

Despite its failures to properly investigate and analyze Doe's claims against Davis, Tulane instituted, and on July 27, 2016, conducted, a Student Conduct Board proceeding against Davis at the conclusion of which Davis was found "Responsible" and expelled.

24.

On July 27, 2016, Doe testified at the Tulane Conduct Board Hearing, addressing the charges against Davis. This was 15 days after she gave the July 12, 2016, followup interview. In her testimony, she declared "I believed Mr. Davis when he told me that he was not drunk because I had only seen him take one shot and allowed him to take me to what I believed was safety."

25.

During the course of her investigation, Doe produced to Vercillo some obviously self curated text messages between Doe and Davis. Doe did not produce text messages which reflected her awareness of Davis' actual intoxication when they left The Boot.

26.

Vercillo did not ask to review or inspect Doe's phone and did not ask to see all of Doe's text messages during the relevant time frames.

27.

Vercillo also received from Davis text messages between Davis and Doe.

28.

On the face of documents produced in connection with the internal student conduct proceeding, it was readily apparent and should have been material to Vercillo, and, later, the Student Conduct Board, that Doe's statement concerning her knowledge of Davis' level of intoxication during both of her interviews and during the course of the conduct hearing was inconsistent with contemporaneous text messages between Davis and Doe as reflected above and as set forth elsewhere herein.

29.

It was further apparent that Doe had inappropriately withheld text messages on that topic. Yet, neither Vercillo nor any member of the Conduct Hearing Board ever examined Doe on that direct contradiction and, as reflective of specific and institutionalized bias, otherwise improperly accepted Doe's assertion as a "victim" and credibility at face.

30.

In connection with the investigation and actual disciplinary proceedings instituted by Tulane against Davis, Tulane breached its contract with Davis and exhibited an institutionalized gender bias against males in violation of Title IX, which violation is pled herein as a breach of Tulane's own policies and procedures.

31.

For example, the governing Code of Student Conduct requires an investigator to "serve as a neutral party" as part of a "non-adversarial" process. As part of the Code of Student Conduct and the contractual obligation, "the investigator determines a witness list, interviews each witness and collects all available information." See Paragraph VII.G(5).

32.

Here, the investigator was not appropriately trained to serve as a neutral party, did not follow a non-adversarial approach, did not serve as a "neutral party," completely failed to properly investigate and "collect all available information," and, as noted above, utterly failed to properly examine Doe.

33.

As represented in the Code of Student Conduct, an investigator is to be specially trained. Hence, Tulane knows or appears to know and is duty bound to know that special training properly perfected is essential to proper adherence to the obligations under the process. Tulane failed to specially or properly train its investigator.

34.

Tulane also knows that students such as Davis are not adequately trained to investigate issues. Tulane affords no training to accused students.

35.

Further, Tulane has the resources to pay an investigator whose obligation it is to appropriately conduct the investigation. It is the job of a student to attend classes, work to keep up with his/her class work, and fulfill commitments to other obligations. Here, Davis was a football player who was required to expend numerous hours in Spring football practice and conditioning, etc.

36.

The suggestion that it was Davis' obligation, as the accused student, to collect all of the information is not only at odds with the contract, but fundamentally unfair and inherently biased. Tulane possessed information before it notified Davis of charges against him, and Tulane was not only fully empowered to seek out such information before charging Davis but was obligated to have done so.

37.

As noted, the investigator failed to obtain Doe's telephone to make an appropriate search of the phone for relevant text messages. As such, Doe was permitted to withhold material text messages, which she did.

38.

With respect to the scheduled hearing, Rodriguez wrote on July 15, 2016, advising Davis that ". . . if you have any concerns about the ability of the panel members to be fair and impartial in this matter," that he was to contact her.

39.

In the correspondence, she identified the panel members by name, but, despite Tulane having pertinent information about the panel members, provided absolutely no background or insight into the history or background of those panel members. No resumes were furnished. No information about any of the Hearing Board members was supplied. Thus, Tulane knowingly possessed material information which it did not disclose to Davis.

40.

Additional breaches of contractual obligations exist as the Conduct Hearing Board included Dennis Kehoe ("Kehoe"), who was then a member of Tulane's Sexual Violence Prevention & Education Coalition ("SVPEC") and Co-Chair of the Faculty Engagement Subcommittee of the SVPEC. Tulane utterly failed to disclose that fact to Davis so Davis could make an informed and

00176473.WPD;1                                             6

appropriate decision as to whether to object to Kehoe's participation on the Hearing Board on the basis of bias.

41.

As a member of the SVPEC , Kehoe was tasked to prevent victims from being revictimized. Further, Tulane has a specific policy of not requiring then designated "victims" to establish their actual status as victims.  To the contrary, it assumes both victimhood and the University's responsibility to support and believe survivor victims.  In that context, Kehoe (and, indeed, the entire University process) was biased in favor of Doe and accepted her status as an actual "victim" and by implication Davis' guilt.  Neither he nor any panel member challenged her asserted "victim" status.

42.

Further, H.P. was a member of the Student Conduct Board.  H.P. identified himself only as an "intern at Student Resources & Support Services" ("SRSS").  Undisclosed to Davis by H.P. or by any member of the Hearing Board or the Office of Student Conduct is that SRSS is included within the operations of the Office of Student Conduct by which Vercillo, the investigator who presented the case against Davis was employed, and of which Rodriguez, the Hearing Board Chair, was the Director.

43.

According to the Tulane website, SRSS includes within its purview the "Office of Case Management and Victim Support Services."  In this case, the complainant, "Doe," was pre-determined by the Office of Student Conduct and, as reflected in the Handbook and elsewhere within University communications,  to be the "victim."

44.

Having someone serve on the Conduct Hearing Board who works in the SRSS which provides "victim" support services to an individual predetermined to be a victim creates an improper bias.  The failure to disclose that fact to Davis and to allow H.P. to be appointed is fundamentally unfair, a breach of contractual obligations and an abuse of rights as it deprives Davis of material information which Davis could seek to excuse H.P. for bias.

45.

Even in the absence of Davis having such information, H.P., Vercillo, Kehoe, and Rodriguez were all required to have recused themselves from serving in any capacity during the hearing as each

was notably biased in favor of the actions of the Office of Student Conduct and were further biased by pre-determinations of Doe as a victim. Further, Vercillo and Rodriguez had already been actively involved in the underlying investigation related to the charges against Davis.

46.

The ability and obligation to determine the lack of fairness and impartiality of Board Members appropriately rested with Tulane, not with Davis. Nonetheless, Tulane inappropriately stacked the Board with biased members and placed the burden of discovery of such bias on Davis while withholding pertinent information from Davis.

47.

At the conclusion of the hearing upon finding Davis responsible, the Board immediately undertook a sanctioning determination.

48.

Without properly considering factors essential to appropriate sanctions, and as Tulane had determined to increase sanctions, the Board expelled Davis.

49.

After Davis was found "Responsible" and expelled, he appealed as per Tulane's appeal policy.

50.

Tulane did not give Davis proper notice of the submission of the appeal.

51.

The Appellate Board denied Davis' appeal.

52.

In denying Davis' appeal, the Appellate Board misstated procedural obligations, displaying misrepresentation when it falsely represented that the Code of Student Conduct ". . . actually establishes an affirmative duty for Mr. Davis to seek out his own witnesses."

53.

That same appellate board decision misrepresented that:

> "Under the Code, Mr. Davis was free to return to The Boot and inquire of its staff and patrons if anyone recalled being in The Boot on the night in question."

54.

Contrary to the representations of the appellate panel which put on Davis the burden of information gathering in a so-called non-adversarial proceeding, the Code of Student Conduct does not in any manner establish an affirmative duty for Mr. Davis to seek out witnesses. To the contrary, under the Code of Student Conduct, it is the obligation of Tulane's investigator to "collect all available information." See Code Paragraph VII.B(5).

55.

To impose the burden of information gathering on Davis violates fundamental fairness, as well as Tulane's contractually established concept of a non-adversarial approach and Tulane's obligation to fully and fairly gather and present all information. Moreover, the timeline of events, financial resources, necessary skill and ability, each mandated that such evidence gathering was Tulane's obligation.

56.

The Appellate Board decision tried to justify both the complainant's failure to provide and Tulane's failure to collect important text messages. In so doing, the decision reveals an obviously biased effort to legitimize the failures of both Tulane and the complaining student when it concluded:

> "Additionally, it should be noted that the Code specifically states that the parties may participate in the process as little or as much as they want to. Given this fact, the complainant was under no obligation to provide any text messages whatsoever."

57.

Not only is that statement in conflict with the direct contractual obligation of Tulane to collect "all evidence," but the appellate panel acted arbitrary and capricious and in direct violation of the Code itself in so concluding. It simply made up and then relied upon a false statement to justify its decision.

58.

In support of its false assertion that the Code of Student Conduct specifically states that parties may participate in the process as little or as much as they want to, the appellate panel cited three provisions in the Code of Student Conduct: Paragraph II(A)(2), Paragraph II(C)(5), and Paragraph II(C)(6). None of those provisions state what the appellate panel so claimed.

59.

Initially, it is clear that Paragraphs II(C)(5) and II(C)(6) do <u>not</u> apply to the behavior of the complainant, but pertain only to the behavior of the respondent student, Davis. Inasmuch as the failure to collect text messages was a failure to obtain information from the complainant, those two paragraphs would have no bearing on Tulane's obligations to collect information from the complainant.

60.

In keeping with the presumption of innocence as provided in the Code, Paragraph II(C)(3) and Paragraph II(C)(5) provide the charged student, Davis, with the right to appear and be heard at a hearing if he so chooses.

61.

Also in keeping with the presumption of innocence, Paragraph II(C)(6) provides the respondent with the right to remain silent.

62.

It is apparent from a review that neither of those provisions "specifically states that the parties may participate in the process as little or as much as they want to."

63.

The misinterpretation of the Code of Student Conduct is even more apparent as Doe, the complaining individual, withheld evidence which Tulane not only failed to obtain, but which fact Tulane failed to explore during the course of Doe's examination or evaluation.

64.

Paragraph II(A)(2) of the Code sets forth the "right[s] of the victim," "To decline or opt to participate in any conduct investigation or proceedings."[1]

65.

Nowhere does that provision say or even indicate that if an individual opts to participate as a "victim," that such individual may pick and choose the items on which she will testify and the information which she can unilaterally refuse to provide. There is no suggestion of partial

_____

[1] As evidence of bias, the Handbook does not even identify an "alleged victim" but assumes a victim status.

participation and certainly no indication that "the Code specifically states that [the victim] may participate in the process as little or as much as they want to."

66.

By so misapplying the Code of Student Conduct, the Appellate Panel essentially concluded that a "victim" can effectively manipulate information by knowing omission and have such omission not impact an assessment of credibility.

67.

Tulane's Appellate Panel breached its contract with Davis by misrepresenting and misapplying the contractual obligation in the Code of Student Conduct.

68.

As further indication of bias and the failure to obtain all relevant information, Tulane wholly ignored Davis' complaint that Doe had battered Davis by attempting to strangle him and by inflicting scratch wounds on his neck.

69.

Tulane's failure to pursue Davis' complaint of battery and resulting injury violates the Code of Student Conduct. Tulane failed to appropriately address the complaint or did not otherwise "accept it" with the result being that Davis would have had a right to appeal. This starkly contrasts with the investigative process followed for Doe's complaint and the ultimate penalties imposed on Davis.

70.

On information and belief, the failure to either pursue this claim by Davis or to appropriately notify Davis of non-acceptance is part of a pattern by Tulane to ignore complaints by males against females and to discriminate against males on the basis of gender.

71.

The inherent bias and breach of contract is further established by the fact that the Code of Student Conduct which governed Davis' rights provides:

> "Cases may be resolved informally or formally. The informal process includes resolution through a restorative resolution process, mediation or pre-hearing conference . . . . In all cases, accused students or groups may elect to proceed through an informal process or to request that the matter proceed through the formal process. If the student conduct administrator designee determines that the charged conduct may result in a sanction of expulsion or suspension,

either because of the nature of the conduct or the student or group's conduct history, the matter generally shall be heard through a hearing board if it is not resolved informally. . . ."  P. 19, Paragraph V(f).

72.

The informal process is set forth in Paragraph VI which affirms that "in all cases, students or groups may elect to proceed through an informal process which, as per Paragraph VI(B), unambiguously includes, but is not limited to, a 'pre-hearing conference.'"

73.

At no time was Davis ever offered an informal process, including either an offer of a the "pre-hearing conference" and/or mediation, as required by the Code of Student Conduct.

74.

Davis denies the accuracy of factual assertions in Doe's text messages. However, taken on their face, Doe's text messages unambiguously assert a desire by Doe to reach resolution with Davis outside of a formal hearing.

75.

Had the informal process been communicated and pursued, the conduct hearing may well have been avoided.

76.

Through its zeal for outcome driven processes as demanded by student and administration activists, Tulane breached and in bad faith breached its obligations under its contract with Davis.

77.

Any failure to have offered this process to Davis was, on information and belief, the result of bias of those responsible for administering the process and/or an internal decision to ignore its contractual obligations by forcing the matter to a Conduct Hearing Board and of Tulane's desire to make an example of Davis.

78.

Additionally, Tulane promulgated a document identified as the Hearing Board Process to be made available in advance of a hearing to help educate charged students as to the hearing process. That document existed at the time of the events placed at issue, having been last revised on or about November 2, 2015, and should have been made available to Davis but was never provided to him.

79.

The Hearing Board Process document states:

> "We recognize that the possibility of being suspended or expelled is
> scary."

80.

Furthermore, the document confirms that Tulane will work with the student "to ensure that

you understand the Hearing Board process, your rights and the steps you can take to present yourself

to the Hearing Board in the best possible light." Significantly, the word "ensure" is synonymous

with the word "guarantee."

81.

In a document separate from the withheld detailed Hearing Board Process, Davis received,

along with the April 21, 2016, charge letter, a document styled "The Hearing Board Process and

Accused Student Rights" which stated, in part:

> "d. The investigator works with all parties and witnesses to collect
> all information, evidence and statements."

82.

Yet, as reflected previously herein, Tulane wrongfully shifted the burden of evidence and

information gathering to Davis. Further, it took no steps to ensure/guarantee Davis' understanding

and the referenced "steps [he could] take." As a consequence, Tulane further breached its contract

in failing to work with Davis, much less, "ensure," that Davis understood the Hearing Board process,

his rights, and the steps to present himself to the Hearing Board in the best possible light.

83.

In the Code of Student Conduct at VII.G.5., Tulane further states that, as to the Procedures

for the Formal Hearing Process, it was to use an investigative model which it then falsely described

as non-adversarial. It further informed that the investigator serves as a neutral party who works with

the parties and collects all available information. In so stating, Tulane recognized its obligations to

fulfill its responsibilities to Davis as a respondent by collecting all available information, evidence,

and statements.

84.

As set forth previously herein, Tulane completely and utterly failed in its responsibility in numerous respects. Further, as a specific example thereof which applied throughout the proceeding, we note the following.

85.

Tulane was contractually required to conduct a "non-adversarial" proceeding in the case against Davis. Howeevr, he entire process was adversarial and Tulane, in May 2017, Senate Minutes, has conceded that the investigative model which it claimed to follow and which it committed would be non-adversarial was, to the contrary, adversarial. Hence, Tulane knew and knows that it did not adhere to its contractual obligations to Davis.

86.

Furthermore, and as explained upon information set forth previously herein, during the Conduct Hearing Board process, the claimant, Doe, made an opening statement. As part of that statement, Doe specifically declared:

> "I believed Mr. Davis when he told me that he was not drunk, because I had only seen him take one shot and allowed him to take me to what I believed was safety."

Had the Tulane investigation and/or the Hearing Panel performed even a modicum of its responsibility, it would have examined Doe on this statement which materially conflicted with other information possessed by the Tulane investigator and the Panel. Yet, the Panel utterly failed to examine or otherwise test Doe's credibility with that information.

87.

Specifically, and as generally reflected elsewhere herein, there was an exchange of text messages between Doe and Davis. When Doe produced her text messages to the Committee which appear as part of the official Hearing Board record, she omitted from that production a specific series of text messages which the Committee received only because Davis had, himself, retained and produced a copy of the text messages between them.

88.

Omitted from the production made by Doe, but specifically contained in the production made by Davis, was the following text message from Doe to Davis:

". . . I know that you were intoxicated and dealing with your own mental imbalances . . ."

89.

Throughout the investigation, the conduct hearing, and the appellate process, Tulane turned a proverbial blind eye to material inconsistencies in Jane Doe's recounting of the incident. Whenever Jane Doe's statements failed to support the charge of sexual misconduct, Tulane's investigator would seek "clarification." The fact that Jane Doe told vastly different stories to different people, lied about her relationship with Davis, and omitted relevant texts when producing texts in the course of the investigation were wholly ignored.

90.

Despite the fact that the Hearing Board knew and/or was obligated to know about the text messages and that Doe's opening statement was false and directly conflicted with Doe's own text message, which it also knew or was duty bound to know she had omitted from production to the Panel, the Panel completely, arbitrarily and capriciously, if not knowingly and intentionally, failed to fulfill its obligation to Davis by failing to examine Doe on that very material inconsistency.

91.

Further, the record reveals a material disparity in its treatment of the claimant and Davis as the Panel vigorously examined Davis, but essentially accepted Doe's claim as a predetermined "victim."

92.

Hearing Boards and Appellate Panels are intended to be and are required to be unbiased and to impose sanctions based upon their best judgment.

93.

Prior to April 2015, Hearing Board Conduct Panels had not been expelling male students from Tulane. Beginning some time after April 2015, in response to protests on campus, the Administration began improperly putting its weight on the scale so as to begin to influence panels outside of the hearing process in such a fashion that, subsequent to the April 2015 student protests, in an effort "to renorm" punishments, Tulane influenced Boards to impose strategically and inappropriately suspensions and expulsions. On information and belief, beginning in December 2015, all findings of sexual misconduct were met with suspension or expulsions.

94.

Jane Doe was well supported and believed without any skepticism by Tulane. To the contrary, in clear violation of the Code requirement of presumed innocence, Davis was presumed guilty. Even when relevant evidence such as corroborating texts from third parties were referenced, they were not properly sought by Tulane.

95.

Biased by its unequivocal support for Doe and the cause of championing female "victims" of sexual assault, Tulane breached its own policies and procedures and found Davis "Responsible."

96.

Devastated, Davis filed the instant suit, the only means to attempt to clear his name and to recover damages from Jane Doe and Tulane. Even in connection with this lawsuit, Tulane's bias and support for Jane Doe appear apparent. Upon information and belief, Tulane assisted Jane Doe from the inception of her internal Tulane complaint through the defense of this civil lawsuit against her. Tulane never took steps to provide Davis with similar legal representation during the internal process.

97.

The attorney retained by Jane Doe in this proceeding is Scott Schneider (hereinafter "Schneider"), who was formerly an in-house legal counsel at Tulane University and who is nationally known in the legal community for representing the interests of universities in connection with lawsuits predicated on allegations of university wrongdoing arising out of conduct proceedings.

98.

On information and belief, Schneider's law firm, Fisher & Phillips, has a consulting or other arrangement with Tulane which may be directly between Fisher & Phillips and Tulane or, on information and belief, may have been arranged in connection with or through United Educators Insurance Company which, on further information and belief, provides insurance coverage for Tulane University in matters such as the present lawsuit.

99.

Schneider is also a frequent speaker on the topic of Title IX and university contractual obligations, and, on information and belief, has himself made reference to jurisprudence in which university bias in connection with conduct proceedings may be supported or established by the fact

00176473.WPD;1                                    16

that a university takes steps to provide an allegedly aggrieved female with legal assistance but does not perform the same service for an accused male.

100.

Scheduled for February 2018, there will be a Title IX presentation in Las Vegas at which Schneider will be co-presenting with Jon Barnwell, Tulane's Superintendent of Police. The identified topic is "Engaging the Unknown: Providing Answers About Title IX and Clery Compliance."

101.

Schneider has also publicly spoken on the need of a university to properly gather evidence, including a complete review of physical cell phones and all phone text messages, rather than allowing a complainant to self select cell phone information. In this matter, Tulane allowed Doe to self select all phone messages she produced rather than insist upon or obtain the cell phone itself with access to full cell phone text streams.

102.

Such conduct by a university is evidence reflective of bias which would constitute a violation of Tulane's contractual obligations to an accused male student (in this case Davis), including contractual obligations to abide by Title IX.

## BREACH OF CONTRACT AND BAD FAITH BREACH OF CONTRACT

103.

Paragraphs 1-102 are restated in their entirety and incorporated by reference herein.

104.

Tulane's conduct as described above and as set forth hereinbelow constitutes a breach of contract and bad faith breach of contract, which renders Tulane liable unto Davis for general and special damages, whether or not foreseeable or foreseen, in the following non-exclusive particulars:

a.     Tulane places the burden of proof on the University while simultaneously maintaining a policy of believing the woman accuser, hence, creating specific bias and essentially nullifying the burden of proof on the University;

b.     Tulane appointed and allowed a biased investigator and Conduct Hearing Board to consider the case;

c.     Tulane failed to disclose to Davis the background of Conduct Hearing Board members which would reveal their bias;

d.     Tulane and the Conduct Hearing Board members failed to disclose the appropriate necessary information for Davis to determine the bias of Hearing Board members and/or the Hearing Board process;

e.     Tulane failed to recuse conflicted biased individuals from the Hearing Board and appeal processes;

f.     Tulane allowed Vercillo to serve as the investigator although she was Assistant Director of Student Conduct;

g.     Tulane allowed Rodriguez to serve as the Hearing Board Chair even though she was the Director of Student Conduct, and she brought the charges against Davis;

h.     Tulane inappropriately allowed bias and a conflicted Kehoe and H.P. to serve on the Conduct Hearing Board without supplying Davis with information of such conflicts and bias;

i.     Tulane failed to properly investigate and obtain evidence concerning Doe's claim and/or failed to meaningfully examine Doe including on obvious inconsistences and illogic in her story which directly undermined her credibility;

j.     Tulane knowingly conducted an inappropriate adversarial proceeding after assuring Davis the proceeding would not be adversarial;

k.     Tulane failed to distribute necessary Hearing Board Process documents to Davis;

l.     Tulane failed to offer to Davis, as provided in and required by the Code of Student Conduct, an informal resolution, including a pre-hearing conference, in advance of a formal hearing;

m.     Tulane made arbitrary and capricious assessments of credibility concerning Doe by inappropriately pre-determining that she was in fact, a "victim" who was to be believed, as reflected in Tulane materials, policy, and prejudicial terminology;

n.     Tulane's bias is reflected in the material difference between the examination of Davis and that of Doe;

o.     Tulane failed to properly inspect Doe's telephone for text messages resulting in its failure to retrieve materially relevant text messages. Notably, the import of such

failures has been reflected in materials presented by Scott Schneider, Esq. ("Schneider"), former in-house counsel at Tulane University and Doe's counsel in this litigation;

p.  Tulane failed to examine complainant on obviously inconsistent statements and therefore failed to create an appropriate record so as to test or challenge Doe's credibility and to thereafter evaluate information, including credibility, in the face of the University's affirmative burden of proof;

q.  Tulane empaneled an Appellate Board which so misrepresented Davis' contractual rights and Tulane's obligation that it improperly imposed obligations on Davis that Tulane was contractually obligated to fulfill.

r.  Tulane inappropriately shifted the burden of producing information and evidence from Tulane to Davis, as reflected in the misguided opinion of the Appeal Panel, and failed to apply Tulane's contractual policies;

s.  Tulane failed to provide Davis with necessary information prior to the hearing;

t.  Tulane failed to afford Davis the requisite presumption of innocence required by the contractual student handbook as well as by the preponderance of the evidence standard;

u.  Tulane succumbed to pressure from student and administrative activists to influence Boards "to renorm sanctions" and to impose more severe penalties against males accused of sexual misconduct, notwithstanding the relevant facts;

v.  Tulane failed to follow proper procedures and considerations regarding the propriety of and severity of sanctions;

w.  Such other breaches and bad faith breaches as are reflected by the facts and evidence; and

x.  Tulane's bias is reflected in any assistance or actions in supplying Doe with counsel or in working with Schneider to represent Doe.

## FACTS REGARDING DEFAMATION

105.

On information and belief, Tulane was informed that Davis intended to transfer to or otherwise enroll at Southeastern University (hereinafter "Southeastern") in Hammond, Louisiana.

106.

As an institution of higher education, Tulane is fully aware of the common practice for universities to seek transcripts and official school records of students who are applying to transfer or otherwise attend a university.

107.

On information and belief, in connection with Davis' request to transfer to Southeastern, Tulane furnished information to Southeastern concerning Davis' official academic record.

108.

On further information and belief, the official academic record produced to Southeastern by Tulane included reference to Davis having been expelled and found "Responsible" for "Sexual Misconduct."

109.

When Tulane furnished Davis' official academic record to Southeastern, Tulane knew or should have known that Tulane failed to satisfy procedural and substantive obligations owed to Davis under Tulane's own policies and procedures, including, without limitation, Tulane's Student Handbook, including Title IX responsibilities.

110.

When Tulane investigated Davis, it ignored materially relevant facts (a) in the course of that investigation, (b) when it charged Davis, (c) when it conducted a hearing on the charges against Davis, (d) when it found Davis "Responsible" for "Sexual Misconduct," (e) when it denied Davis' appeal, (f) when it ignored Davis' complaint against his accuser, (g) when it ultimately expelled Davis, and (h) when it furnished Davis' "official" academic record to Southeastern.

111.

Because Tulane knew that the entire proceeding and its finding of "Responsible" were based on procedural defects, and substantive defects, and were the result of blatant gender bias, Tulane knew or should have known that the representation to a third party that Davis was found "Responsible" for proven "Sexual Misconduct" was substantively false.

112.

Moreover, because Tulane knew or should have known that such improperly generated conclusions and unsubstantiated representations would cause harm to Davis, Tulane's acts were made with a malicious intent.

113.

On information and belief, Tulane further falsely informed Southeastern that Davis committed a sexual assault, raped and/or otherwise physically violated Jane Doe.

114.

Tulane defamed Davis when it transmitted Davis' official Tulane academic record and further communicated with Southeastern concerning Davis addressing or representing that Davis was expelled or found responsible for sexual misconduct.

115.

Furthermore, shortly after this lawsuit was filed and Jane Doe was served with the lawsuit, Davis was contacted by the New Orleans Police Department (hereinafter "NOPD") concerning an investigation of allegations of rape.

116.

On information and belief, representatives of Tulane, acting within the course and scope of their employment, contacted and falsely informed the NOPD that Davis had committed a sexual assault, raped and/or otherwise physically violated Jane Doe.

117.

On information and belief, Tulane made that contact in retaliation against Davis for his having filed suit and/or to provoke a criminal prosecution against Davis to attempt to substantiate its erroneous finding of "Responsible."

**ABUSE OF RIGHTS**

118.

Tulane is responsible for abuse of rights insomuch as Tulane's conduct violates morals and good conduct. Tulane was in an absolute position to fully and appropriately investigate all claims of misconduct, to properly investigate charges and to conduct a proper and unbiased hearing and appeal.

119.

Inasmuch as Tulane is biased against males in favor of females, and inasmuch as Tulane has made a policy decision to believe and support those who are identified as "victims," Tulane knowingly and willfully abrogated its responsibilities to perform a full and complete investigation, hearing and appeal, resulting in an immoral and inappropriate finding of responsible against Davis.

120.

The degree to which Tulane ignored its own procedures and obligations, including, but not limited to, not conducting a pre-hearing conference, not distributing necessary information to Davis, ignoring vital evidence, not seeking vital evidence, presuming victimhood, compiling a biased Board and incompetent Conduct Hearing Board whose statements mock the obligations of the Handbook, seeking to and improperly influencing hearing boards to impose extreme sanctions, constitutes an actionable indifference to Davis' rights.

121.

Based upon each of the foregoing, Tulane has materially damaged Davis in the following particulars. Davis has suffered significant distress, embarrassment, humiliation, and damage to reputation. His earning capacity has been severely impacted with the certain loss of opportunity to play football in the National Football League. He has further lost the value of a scholarship.

122.

As a result of Tulane's wrong, Davis is entitled to recovery of all general damages which are just in the premises, whether or not foreseeable or foreseen. He is entitled to special damages in the form of impaired earning capacity, lost earnings, loss of value of scholarship, and any future out-of-pocket costs due to the loss of scholarship.

123.

Davis is further entitled to judicial interest from date of breach and/or judicial demand, whichever is proper, plus all recoverable costs.

124.

Davis prays for a **TRIAL BY JURY**.

**WHEREFORE,** Leonard Davis prays that this Second Supplemental and Amending Petition be filed and served on defendants and after all due proceedings are had, that there be judgment in his favor on all claims and for recoverable general and special damages as all are provided and/or just in the premises, whether or not such damages were foreseen or unforeseen, and for all general and equitable relief. Davis further prays for all categories of damages asserted or prayed for in the body of the Petition, plus all interest and recoverable costs.

Respectfully Submitted:

**G. Frederick Kelly, III (1458)**
**G. Frederick Kelly, III, LLC**
**2917 Magazine Street, Suite 201**
**New Orleans, La. 70115**
**Telephone: (504) 269-8188**
**Facsimile: (504) 309-7864**

**AND**

**Richard V. Kohnke, Sr. (1166)**
**2917 Magazine Street, Suite 201**
**New Orleans, La. 70115**
**Telephone: (504) 899-6864**
**Facsimile: (504) 899-6858**

**AND**

**Edward F. Kohnke, IV(07824)**
**2917 Magazine Street, Suite 201**
**New Orleans, La. 70115**
**Telephone: (504) 899-6864**
**Facsimile: (504) 899-6858**

**Counsel for plaintiff, Leonard Davis**

**PLEASE SERVE:**

**THE ADMINISTRATORS OF THE TULANE EDUCATIONAL FUND,**
through its counsel of record,
Kim M. Boyle, Esq.
Phelps Dunbar LLP
Canal Place
365 Canal Street-Suite 2000
New Orleans, Louisiana 70130

**JANE DOE**
through her counsel of record,
Scott D. Schneider, Esq.
Fisher Phillips
201 St. Charles Avenue
Suite 3710
New Orleans